IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ALYK, INC.,<br><br>Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jane Doe ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant, ALYK, Inc. ("Defendant" or "ALYK"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of the undersigned counsel.

## NATURE OF THE ACTION

1. This is a class action suit brought against ALYK for breaching its customers' trust and allowing companies scattered around Silicon Valley to invade its customers' privacy through its website, mylola.com (the "Website"). In particular, ALYK helped Google LLC ("Google") and Wingify Software Pvt. Ltd. ("Wingify") (collectively the "Third Parties"), collect and intercept customers' communications with ALYK as consumers either searched for products on the Website by typing search terms into the search bar or adding particular items to their carts to purchase.

2. ALYK is a business specialized in providing "clean feminine care products," which include menstrual, vaginal, and sexual care products.[1] Given the highly personal and sensitive nature of ALYK's business, consumer's communications with the Website are confidential.

---
[1] ALYK, ABOUT, https://mylola.com/pages/about.

1

3. Whichever tampons, condoms, or vibrators a person is looking to buy is no one else's business. Except for Google and Wingify. As it turns out, the shopkeeper, ALYK, has allowed these Third Parties to snoop on shopper's electronic communications through its Website. Using tracking tools, ALYK has enabled these Third Parties to intercept whatever shoppers type into the site's search bar or whatever menstrual, vaginal, and sexual wellness products these consumers browse for. All of this is done to help Defendant with its marketing, advertising, and data analytics efforts and increase Defendant and these Third Parties' profits.

4. The nature of the Third Parties' licensing agreements with Defendant are such that Defendant "aids, agrees with, employs, or conspires" to permit the Third Parties to read, attempt to read, learn, and/or use the confidential communications of Website visitors without prior consent, thus violating the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631(a) and 632.

5. Plaintiff brings this action individually and on behalf of all California residents who conducted searches for products on the Website while in California or browsed for products on the website, and whose electronic communications were intercepted or recorded by Google and Wingify. Defendant has enabled these Third Parties to intercept visitors' communications by employing these Third Parties' services to track users across the Website.

## THE PARTIES

*Plaintiff*

6. Plaintiff Jane Doe is an adult citizen of the state of California and resides in Los Angeles, California.

7. In February of 2025, Plaintiff Doe visited Defendant's Website while in California. On the Website, Plaintiff searched for "organic tampons" on the Website's search bar. Plaintiff Doe's communications with Defendant – including the search terms she entered into the Website's search bar were intercepted in transit by the Third Parties as enabled by Defendant. Neither Defendant nor the Third Parties procured Plaintiff Doe's prior consent to this interception on the Website. Plaintiff Doe did not discover and could not have discovered this violation until her retention of counsel.

8. Plaintiff values her reproductive privacy and wishes to proceed with this case anonymously. She fears that the public disclosure of her identity will subject her harassment, ridicule, embarrassment, and potential retaliation.

*Defendant*

9. Defendant ALYK, Inc. ("ALYK") is a Delaware corporation with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

11. The Court has general jurisdiction over Defendant because Defendant's principal place of business is in the State of New York, meaning Defendant is at home in this forum.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this district.

## FACTUAL ALLEGATIONS

I. **OVERVIEW OF THE THIRD PARTIES' TRACKING TOOLS**

13. Defendant has purposefully installed Google and Wingify's tracking tools on its Website. Therefore, Defendant has enabled Google and Wingify to intercept Plaintiff's and Class Members' communications by employing the Third Parties' Tracking Tools on its Website in the manner described throughout this Complaint.

    A. **Google Analytics**

14. Google offers a range of advertising software, one of which is called Google Analytics.

15. "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights" for businesses.[2] This is made possible by the Google Analytics Pixel, a piece of code installed on a website that collects information on how website users interact with a business's website, such as "how many users bought an item ... by tracking whether they made it to the purchase-confirmation page."[3]

16. Google advertises this service can "[m]onitor activity on your site as it happens."[4]

17. Google's business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the Google Analytics Pixel.

18. Thus, through websites that employ Google's services, Google directly receives the electronic communications of website visitors entered into websites via website features like search bars.

19. That information is then analyzed by Google before being provided to any entity that was a party to the conversation (like Defendant). Upon information and belief, in order to analyze the intercepted communications, Google views the intercepted communications. As such, on information and belief, Google viewed Plaintiff and Class Members' communications with Defendant in order to provide advertising services to Defendant.

20. Once Google intercepts website communications, it has the capability to use such information for its own purposes. "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[5]

---

[2] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447?hl=en&ref_topic=14089939&sjid=2827624563183915220-NC.

[3] Id.

[4] GOOGLE, THE FINER POINTS, https://marketingplatform.google.com/about/analytics/features/.

[5] GOOGLE, GOOGLE PRIVACY AND TERMS, https://policies.google.com/technologies/partner-sites.

21. Google's range of software services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits. This involves collecting visitor information from thousands of websites and then analyzing that information in order to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

22. Google views the contents of the communications it intercepts in order to engage in its analyzation of the data. Google states that once the Google Analytics code on a website "collects data, it packages that information up and sends it to Google Analytics to be processed into reports. When Analytics processes data, it aggregates and organizes the data based on particular criteria."[6]

23. Information from websites, like Defendant's Website, is central to Google's ability to successfully market its advertising capabilities to future clients.

24. In sum, Google has the capability to use the communications it intercepts for own purposes other than simply providing a recording to its customers, including but not limited to (i) improving its own products and services; (ii) developing new Google for Business and Google Analytics products and services; and (iii) analyzing website visitors' communications to assist with and data analytics and targeted advertising.

   **B.    Wingify's Business Tools**

25. Wingify is a marketing platform company that provides website owners with various solutions, through its product VWO, such as website visitor personalization and behavior analytics.

26. Wingify's services operate on a website by having the website owner install Wingify's JavaScript code snippet onto its website.[7]

---

[6] GOOGLE, *How Google Analytics Works*, https://support.google.com/analytics/answer/12159447?hl=en#.

[7] Wingify, *Before you get started with VWO,* https://help.vwo.com/hc/en-us/articles/360019588853-Before-you-get-started-with-VWO.

27. To provide website personalization, Wingify compiles and uses data of website visitors' behavior on a website to "craft and release personalized experiences for them."[8] Website visitors' behavioral data includes "website engagement or browsing behavior data" that is captured and collected "[a]s visitors navigate through your site … in the form of events."[9] Each user experience that Wingify creates using the users' behavioral data, known as an "experience campaign," is triggered based on "visitors' persona or events like when one refreshes a page, when they've scrolled a certain depth, to the time they've spent on a page, among others."[10]

28. Website owners can also create audience segments based on the data collected to then prompt those segments or "personas" with "particular experiences to build personalized journeys." [11]

29. Wingify's visitor behavior analysis service involves six different "features" to help its customers "conduct a 360-degree qualitative analysis for endless optimization ideas."[12] Some of those features include session replay services, heatmaps, and user segments.[13]

30. Wingify's session replay software allows Wingify's consumers to "record [their] visitor interactions with [their] website and replay them in a form of a video.  These recordings show how users interact with [their] website, by capturing their mouse movements, scrolls, and clicks."[14]

31. Website owners, such as Defendant, can then analyze the session recordings to "[d]ecipher user engagement patterns" or review the generated "event list" cataloging users' actions on the website based on specific events.[15]

---

[8] Wingify, *Personalization*, https://vwo.com/personalization/.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] Wingify, *Behavior Analytics*, https://vwo.com/insights/.

[13] *Id.*

[14] Vaibhav Singh, *What are Session Recordings in VWO?*, VWO, https://help.vwo.com/hc/en-us/articles/360019732913-What-are-Session-Recordings-in-VWO.

[15] Wingify, *Session Recordings*, https://vwo.com/insights/session-recordings/.

32. Because Wingify's session replay captures all user behavior on a website, Wingify allows its customers to "[e]nable safety" features that "[a]utomatically hide personal identifiable info."[16] Even so, Defendant did not enable this feature given that Wingify is able to intercept Defendant's patients' communications as shown below.

33. Wingify's business model involves entering into voluntary partnerships with various companies and surveilling communications on its partners' websites with its software.

34. Thus, through websites that employ Wingify's services, such as Defendant's Website, Wingify directly receives the recording of each website visit, including electronic communications of website visitors entered into search bars, chat boxes, and online quizzes, in real time.

35. Because Defendant utilizes Wingify's service, Wingify's embedded JavaScript code operates within users' browsers, tracking the users' interactions (e.g., clicks, scrolls, typing, and other input data) on the Website within which the code is embedded without the users' knowledge and transmitting the information to Wingify's servers. In this manner, Wingify effectively obtains a recorded replay of the users' experiences on the site. The data transmission described herein occurs concurrently with each user's activity, enabling Wingify to intercept sensitive data as it is generated. In other words, Wingify's interception of users' communications on the Website occurs "in transit."

36. When integrated and embedded into a website, Wingify's software is not akin to a tape recorder or a "tool" used by one party to simply record the other. Instead, it involves Wingify, a separate and distinct third-party entity from the parties in the conversation, using software to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because Wingify itself is collecting the content of any conversation. That information is then analyzed by Wingify before being provided to any entity that was a party to the conversation (like Defendant).

---

[16] *Id.*

37. Because Wingify analyses data it intercepts from its customers' website to provide its customers with behavioral analytics, Wingify views the communications it intercepts. For example, as part of its behavioral analytics service, Wingify facilitates the creation of segments for data analysis. This includes using "segmentation parameters such as query parameters"[17] [which will include search terms if the website, such as Defendant's Website, includes search terms in the URLs as a query parameter].

38. Wingify's services are based on its ability to collect and analyze consumer's web behavior and deliver that data to present and future customers, who use that data for targeted advertising, product optimization, and ultimately, monetization.

39. Information from websites, like Defendant's Website, is central to Wingify's ability to successfully market their advertising capabilities to future clients.

## II. DEFENDANT ENABLES THE THIRD PARTIES' INTECEPTION OF ITS WEBSITE USERS' COMMUNICATIONS

### A. Defendant Enables Google, Through Google Analytics, To Intercept Users' Communications With Defendant.

40. Defendant has integrated Google Analytics into its Website. By integrating Google Analytics into its Website code, Defendant has enabled Google to intercept Defendant's Website users' communications with Defendant as users search and browse for products without users' consent.

41. Through Google Analytics, Defendant enables Google to intercept users' communications with Defendant. When a user conducts a search on Defendant's website, communicating with Defendant that they are interested in a particular product, because Defendant installed Google Analytics on its Website, Google Analytics collects the URL for the page the user is accessing from the Website and therefore also intercepts the search terms the user typed into the Website's search bar – which are in the URL.

For example, when a user searches for "condoms" on the Website, Google Analytics intercepts this communication by collecting the URL of the web page which includes the exact search term the user communicated to Defendant. *See* Figure 1.

---

[17] VWO, https://vwo.com/insights/funnels/.

**Figure 1**



42.     Further, when a Website user decides to purchase an item, Google will know the name of the exact item added to the user's cart. As seen in Figure 2, when a Website user adds the "Mini Vibrator" item to their cart, Google obtains that information.

**Figure 2**



B.   **Defendant Enables Wingify, Through Its VWO Software, To Intercept Users' Communications With Defendant**

43.   Defendant has integrated Wingify's VWO code into its Website. By doing so, Defendant has enabled Wingify to intercept Defendant's Website users' communications with Defendant as users search and browse for products without users' consent.

44.   Through Wingify's code, Defendant enables Wingify to intercept users' communications with Defendant. When a user conducts a search on Defendant's website, communicating with Defendant that they are interested in a particular product, because Defendant installed Wingify's code on its Website, Wingify collects the URL for the page the user is accessing from the Website and therefore also intercepts the search terms the user typed into the Website's search bar – which are in the URL.

10

45.     For example, when a user searches for "condoms" on the Website, Wingify intercepts this communication by collecting the URL of the web page which includes the exact search term the user communicated to Defendant.  *See* Figure 3.

**Figure 3**



### III.   SEARCH TERMS AND ITEMS ADDED TO SHOPPING CARTS ON THE WEBSITE ARE COMMUNICATIONS.

46.     Users' search terms and items added to a shopping cart on Defendant's Website are communications that are a product of users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated).

47.     The names of products users search for and add to their shopping carts on Defendant's Website are personal information because they "divulge a user's personal interests,

11

queries, and habits." *See In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d at 605 (9th Cir. 2020).

## VI. DEFENDANT NEVER RECEIVED USERS' CONSENT TO EMPLOY THE THIRD PARTIES' TRACKING TOOLS TO INTERCEPT USERS' COMMUNICATIONS

48. Defendant allows the Third Parties to intercept users' confidential communications without obtaining users' consent.

49. At no point during a person's use of the Website does Defendant inform users that Defendant enables third parties to intercept users' communications with Defendant.

50. When a user searches for products on the Website or adds products to their shopping carts, Defendant does not provide users with any type of notice about its practice of allowing third parties to intercept user communications with Defendant.

51. Thus, Defendant never properly obtains consent from its users to disclose their communications from the Website.

## CLASS ACTION ALLEGATIONS

52. Plaintiff Jane Doe seeks to represent a class of all California residents who entered information into Defendant's Website, mylola.com, by conducting searches using the search bar on the Website and/or adding products to their shopping cart, while located in California (the "Class").

53. Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

54. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

55. Excluded from the Class are ALYK; any affiliate, parent, or subsidiary of ALYK; any entity in which ALYK has a controlling interest; any officer director, or employee of ALYK; any successor or assign of ALYK; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

56. **Numerosity.**  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in the Class.  Class Members can be readily identified from ALYK's records and non-party records, such as those of Google and Wingify.

57. **Typicality.**  Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all other members, visited ALYK's Website and had her confidential electronic communications intercepted and disclosed to one of the Third Parties.

58. **Adequacy.**  Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.  Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

59. **Common Questions of Law and Fact Predominate.**  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Class include, but are not limited to, the following: whether Defendant violated CIPA § 631 and/or § 632 and whether Plaintiff and the proposed Class Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

60. **Superiority.**  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not

13

practicably be pursued individually, substantially outweigh potential difficulties in the management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## **CLAIMS FOR RELIEF**

### **COUNT I**
**Violation Of The California Invasion of Privacy Act,**
**Cal. Penal Code § 631**

61. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

62. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

63. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

> *Or*

> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

> *Or*

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

64. CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

65. The Third Parties' Tracking Tools are a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

66. The Third Parties, Google and Wingify, are "separate legal entit[ies] that offer[] [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes. Accordingly, Google and Wingify were third parties to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

67. At all relevant times, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

68. At all relevant times, the Third Parties used or attempted to use the communications intercepted by their Tracking Tools to promote and improve their advertising platforms.

69. At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiff and Class Members using the Tracking Tools and to accomplish the wrongful conduct at issue here.

70. Plaintiff and Class Members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications. Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct.

71. The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Website and where the Third Parties—as enabled by Defendant—routed Plaintiff and Class Members' electronic communications to their servers.

72. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT II
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 632

73. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

74. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

75. CIPA § 632(a) prohibits entities from**:**

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

76. The Third Parties' Tracking Tools are "electronic amplifying or recording device[s]."

77. At all relevant times, the communications between Plaintiff and Class Members on one hand, and ALYK on the other, were confidential.

78. At all relevant times, Google and Wingify intentionally used the Tracking Tools to eavesdrop upon and record such confidential communications.

16

79. When communicating with ALYK, Plaintiff and Class Members had an objectively reasonable expectation of privacy. Plaintiff and Class Members did not reasonably expect anyone other than ALYK to be a party to the communications, and did not expect that other, third-party entities, Google and Wingify, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record their confidential communications.

80. Plaintiff and Class Members did not consent to any of the Third Parties' actions. Nor have Plaintiff and Class Members consented to the Third Parties' intentional use of an electronic amplifying or record device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

81. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a) For an order certifying the putative Class, naming Plaintiff as the representative of the putative Class, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class Members;

(b) For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the putative Class on all counts asserted herein;

(d) For statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiff and the putative Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the proposed Class, demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: April 21, 2025

Respectfully submitted,

By: */s/ Stefan Bogdanovich*
    Stefan Bogdanovich

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (*pro hac vice forthcoming*)
Stefan Bogdanovich
Ines Diaz Villafana (*pro hac vice forthcoming*)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
       sbogdanovich@bursor.com
       idiaz@bursor.com

*Attorneys for Plaintiff*